# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |  |
|---|---|---|
| THE TRAVELERS INDEMNITY COMPANY, on its own behalf and as Assignee of Surry County, North Carolina, | ) ) ) ) | |
| Plaintiff, | ) ) | 1:22CV404 |
| v. | ) ) | |
| AMERICAN ALTERNATIVE INSURANCE CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiff The Travelers Indemnity Company ("Travelers") initiated this action under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaratory judgment against American Alternative Insurance Corporation ("AAIC"), alleging that AAIC failed to fulfill its obligation to contribute to the defense and settlement of two underlying state actions involving AAIC's insured, Surry County, and its employees. (ECF No. 1 ¶¶ 1, 11.) Before the Court are AAIC's Motion for Summary Judgment, (ECF No. 41), Travelers' Motion for Summary Judgment, (ECF No. 43), and AAIC's Objection and Motion to Disregard, (ECF No. 55). For the reasons that follow, AAIC's Motion for Summary Judgment will be denied in part and granted in part, Travelers' Motion for Summary Judgment will be granted in part and denied in part, and AAIC's Objection and Motion to Disregard will be denied as moot.

## I.    BACKGROUND

In September 2018, Travelers issued a general liability insurance policy and an excess liability insurance policy to be held by Surry County, North Carolina ("Surry County" or the "County"), (ECF No. 1-1 at 8, 29, 247), with a primary liability limit of $1,000,000 per occurrence and an excess limit of $8,000,000 per occurrence, (*id.* at 29, 247).  In July 2018, AAIC issued a general liability insurance policy (the "AAIC General Liability Policy" or the "General Liability Policy") and an excess liability insurance policy (the "AAIC Excess Policy" or the "Excess Policy") to be held by Surry County, (ECF No. 1-2 at 4), with a primary liability limit of $1,000,000 per occurrence and an excess limit of $7,000,000 per occurrence, (*id.* at 36, 60).  A Named Insured Limitation Endorsement naming Surry County Emergency Services ("SC Emergency Services") as the only emergency services organization covered was included in each of AAIC's policies.  (*Id.* at 37, 79.)

On the morning of May 20, 2019, a fire began at a two-story apartment building in the College Place apartments located on College Place Avenue in Dobson, Surry County, North Carolina.  (ECF Nos. 1 ¶ 6; 42-13 ¶¶ 23, 37; 42-14 at 8, 10.)  Four teenagers—Taylor Chipman, Ryan Gwyn, Kathleen Woods, and Mikaila Moses (the "Victims")—were on the second floor of the apartment building.  (ECF Nos. 42-13 ¶¶ 1, 5, 25, 35; 42-14 at 8–9.)  Ms. Woods, one of the Victims, then called 911, and the call was received by the Surry County Emergency Communications Center (the "SC Emergency Communications Center").  (ECF Nos. 42-13 ¶ 45; 42-14 at 10.)  At the time of the fire, Joseph Shores and Robert Cook (collectively, the "911 Operators") were on duty at SC Emergency Communications Center.  (ECF Nos. 42-13 ¶¶ 37–38; 42-14 at 10.)

It was the 911 Operator Mr. Cook that answered Ms. Woods' call, at which time he was informed that she and the others were located "upstairs," and that the front door of the apartment unit was on fire. (ECF Nos. 42-13 ¶ 45; 42-14 at 10.) Ms. Woods informed Mr. Cook that she could open a window; however, Mr. Cook instructed her not to break or open the window. (ECF Nos. 42-13 ¶¶ 49–50; 42-14 at 11.) Rather, Mr. Cook instructed Ms. Woods to "hunker down and shelter in place," promising that she and the other Victims would be rescued. (ECF No. 42-15 at 3.) Emergency responders later arrived at the apartment building and entered the back bedroom of the apartment unit to find three of the four Victims deceased. (*Id.* at 4.) The fourth Victim died shortly thereafter. (*Id.*) The cause of death of all of the Victims was smoke inhalation. (*Id.*)

In October 2020 and March 2021, two lawsuits were filed by the proper representatives of the estates of the Victims in the Superior Court of Surry County against Surry Endeavor, LLC ("Surry Endeavor"),[1] Surry County, SC Emergency Communications Center, SC Emergency Services, Mr. Shores, and Mr. Cook (the "Underlying Lawsuits"). (ECF No. 1 ¶ 7; *see generally* ECF Nos. 42-13; 42-14 at 5–26.) With respect to Surry County and the 911 Operators, the complaints in the Underlying Lawsuits alleged that the 911 Operators negligently and improperly handled the 911 call for fire emergency services from the Victims, and that Surry County failed to properly staff, train, and supervise the 911 Operators. (ECF Nos. 1 ¶ 7; 42-13 ¶¶ 112, 115–22, 125, 99–105; 42-14 at 21–23, 18–19.) Travelers and AAIC each agreed to provide a defense to the Underlying Lawsuits in accordance with reservations of rights letters issued by each insurer. (ECF Nos. 1 ¶ 14; 6 ¶ 14; 42-10 at 2, 42-12 at 2.)

---

[1] Surry Endeavor, LLC, is the owner of the property on which the College Place apartments are situated. (ECF Nos. 1 ¶ 7; 42-13 ¶ 23; 42-14 at 8.)

Further, Travelers and AAIC agreed to equally split the cost of the defense.  (ECF Nos. 1 ¶ 14; 6 ¶ 14.)

Upon the motion of the defendants in the Underlying Lawsuits, because SC Emergency Services and SC Emergency Communications Center are departments of Surry County and not independent legal entities capable of being sued, the two departments were dismissed from the suits.  (ECF Nos. 1 ¶ 8; 6 ¶ 8.)  This left Surry County, the 911 Operators, and Surry Endeavor as remaining defendants.  (ECF Nos. 1 ¶ 8; 6 ¶ 8.)  Further, because the claims against Surry Endeavor were resolved in a settlement that did not involve Travelers or AAIC, Surry County and the 911 Operators were ultimately the only remaining defendants in the Underlying Lawsuits. (ECF Nos. 1 ¶¶ 8–9; 6 ¶ 8–9.)  AAIC continued to defend Surry County and the 911 Operators in the Underlying Lawsuits following the dismissal of SC Emergency Services and SC Emergency Communications Center from both actions and never sought to withdraw from the defense.  (ECF Nos. 1 ¶ 14; 6 ¶ 14.)

On February 2, 2022, counsel for the Victims in the Underlying Lawsuits made a "Confidential, Time-Limited Policy Limits Demand" to settle all the Victims' claims against Surry County and the 911 Operators for "combined policy limits of $9,000,000."  (ECF Nos. 1 ¶ 15; 42-15 at 2, 7.)  Travelers demanded that AAIC contribute to this settlement, but AAIC refused to do so.  (ECF No. 1 ¶ 17–18.)  Travelers ultimately paid its policy limits of $9,000,000 to settle the claims, (*id.* ¶ 19), but reserved the right to seek contribution from AAIC, (ECF No. 42-26 at 4).

On May 27, 2022, Travelers filed the instant lawsuit against AAIC pursuant to 28 U.S.C. § 2201 seeking a declaratory judgment from this Court that it is entitled to recover from AAIC for the defense and settlement of the Underlying Lawsuits.  (ECF No. 1 ¶ 1.)  On July 7, 2023,

4

AAIC moved for summary judgment, (ECF No. 41), and Travelers likewise moved for summary judgment, (ECF No. 43).

Additionally, in support of its argument regarding the amount it may have to contribute to the settlement of the Underlying Lawsuits, AAIC filed a motion for leave to file a surreply, requesting this Court's permission to file a surreply in accordance with Local Rule 7.6 and Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 50 at 1.) The Court granted AAIC's motion. (ECF No. 52 at 1.) AAIC filed its Surreply, (ECF No. 53), and Travelers filed a Response to the Surreply, (ECF No. 54), without seeking leave of the Court. AAIC filed an Objection and Motion to Disregard on November 8, 2023, requesting that this Court disregard Travelers' Response to the Surreply. (ECF No. 55 at 1.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (citations and internal quotation marks omitted). "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the nonmoving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

5

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324. Where, as in this case, the Court has before it cross-motions for summary judgment, the Court reviews each motion separately to determine if either party is entitled to judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## III. CROSS-MOTIONS FOR SUMMARY JUDGMENT

AAIC argues that it is entitled to summary judgment on Travelers' claims for declaratory judgment and contribution because its insurance policies do not provide coverage to Surry County or the 911 Operators for the claims in the Underlying Lawsuits according to the policies' Named Insured Limitation Endorsements. (ECF No. 42 at 13, 16.) Travelers argues that it is entitled to summary judgement on its claims because the AAIC policies provide coverage for the claims in the Underlying Lawsuits involving Surry County and the 911 Operators "so that AAIC must reimburse Travelers for its portion of the settlement" of the Underlying Lawsuits. (ECF No. 44 at 1.)

6

As a preliminary matter, this Court concludes that North Carolina substantive law applies here. Neither Party contests that this Court has subject matter jurisdiction in this action based on diversity of citizenship, (*see* ECF Nos. 1 ¶¶ 2–4; 6 ¶¶ 2–4), and this Court thus looks to North Carolina's choice of law principles for guidance in making such a determination. *See Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*, 313 U.S. 487, 496–97 (1941). Under North Carolina law, when the parties' dispute involves an insurance policy, the law of the state in which the policy was issued governs the dispute. *See Roomy v. Allstate Ins. Co.*, 123 S.E.2d 817, 820 (N.C. 1962). The Travelers policies and the AAIC policies were issued in North Carolina, with Surry County as the Named Insured. (ECF Nos. 1-1 at 2; 1-2 at 4.) Therefore, the Court must interpret the AAIC policy in accordance with North Carolina substantive law.

A. **Whether the AAIC General Liability Policy and the AAIC Excess Policy Provide Coverage to Surry County and the 911 Operators**

In North Carolina, it is a well-settled principle that "an insurance policy is a contract and its provisions govern the rights and duties of the parties thereto." *Fidelity Bankers Life Ins. Co. v. Dortch*, 348 S.E.2d 794, 796 (N.C. 1986). When interpreting an insurance policy, courts are to construe the policy's provisions to determine the insurance coverage intended by the parties at the time the policy was issued. *Woods v. Nationwide Mut. Ins. Co.*, 246 S.E.2d 773, 777 (N.C. 1978); *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970). "The interpretation of language used in an insurance policy is a question of law" for the court. *Allstate Ins. Co. v. Runyon Chatterton*, 518 S.E.2d 814, 816 (N.C. Ct. App. 1999).

"If policy language is clear and unambiguous, the court's sole duty is to 'determine the legal effect of the language used and to enforce the agreement as written.'" *Kephart by Tutwiler v. Pendergraph*, 507 S.E.2d 915, 919 (N.C. Ct. App. 1998) (quoting *Cone Mills Corp. v. Allstate Ins. Co.*, 443 S.E.2d 357, 359 (N.C. Ct. App. 1994)). However, where the policy language is

7

ambiguous, such ambiguities must "be construed in favor of coverage and against the insurer." *First Nat'l Bank of Anson Cnty. v. Nationwide Ins. Co.*, 278 S.E.2d 507, 515 (N.C. 1981). "An ambiguity exists where, in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions asserted by the parties." *Maddox v. Colonial Life and Accident Ins. Co.*, 280 S.E.2d 907, 908 (N.C. 1981).

In determining the scope of coverage issued under AAIC's policies—the AAIC General Liability Policy and the AAIC Excess Policy—the Court must scrutinize the pertinent language of each policy and note where ambiguity, if any, exists in such language.[2]

### 1. The AAIC General Liability Policy

The Court begins by reviewing the pertinent terms of AAIC's General Liability Policy.

**SECTION I.          COVERAGES**

**Coverage A.  Bodily Injury and Property Damage Liability**

**1.          Insuring Agreement**

> a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

. . . .

> b.  This insurance applies to "bodily injury" and "property damage" only if:

---

[2] The Court acknowledges that AAIC offers arguments about what AAIC, the County, and the Victims may have believed was the coverage or the lack thereof of the AAIC policies for the Underlying Lawsuits. (*See* ECF No. 42 at 20–22.) AAIC does not provide law to support these arguments, and therefore the Court will not consider these arguments further in its interpretation of either of AAIC's policies.

(1) The "bodily injury" or "property damage" is caused by an
"occurrence"[3] . . . .

(ECF No. 1-2 at 40.)  Under the policy, "bodily injury" means "bodily injury, sickness or

disease sustained by a person, including death resulting from any of these at any time."  (*Id.* at

54.)

The Named Insured Limitation Endorsement of the General Liability Coverage Part,

naming SC Emergency Services as the only covered emergency services organization in its

schedule, provides:

> This insurance applies only to "bodily injury", "property damage", "personal
> and advertising injury" or "professional health care services" covered by this
> insurance and arising out of the firefighting, ambulance, rescue or other
> emergency services, including operations incidental thereto, of the covered
> emergency service organization(s) shown in the schedule.

(*Id.* at 37.)

The meaning of this particular provision is what is chiefly disputed by the Parties.

AAIC argues that the proper interpretation of the language in this Named Insured Limitation

Endorsement reveals that the policies only cover "claims involving injury arising out of

emergency services provided by SC Emergency Services or operations of SC Emergency

Services that are incidental to the emergency services [SC Emergency Services] provides."

(ECF No. 42 at 16.)  AAIC contends that the claims in the Underlying Lawsuits meet neither

of these criteria.  (*Id.* at 16, 18.)  Travelers argues, on the other hand, that the language of this

Named Insured Limitation Endorsement provides coverage for "any injuries or damages

---

[3] Under the policy, "'[o]ccurrence' means an accident, including continuous or repeated exposure to
substantially the same general harmful conditions." (ECF No. 1-2 at 56.)  "Accident" is not defined
by the policy.  However, North Carolina courts have defined "accident" as "an unforeseen event,
occur[r]ing without the will or design of the person whose mere act causes it; an unexpected, unusual,
or undesigned occurrence." *Builders Mut. Ins. Co. v. Mitchell*, 709 S.E.2d 528, 531 (N.C. Ct. App. 2011)
(alteration in original) (quoting *Tayloe v. Hartford Accident & Indem. Co.*, 127 S.E.2d 238, 239–40 (N.C.
1962)).

arising out of" any "operations incidental to [SC Emergency Services'] provision of emergency services," not just those arising out of incidental operations performed by SC Emergency Services. (ECF No. 46 at 2.) According to Travelers, the 911 Operators were performing operations "incidental to" the emergency services provided by SC Emergency Services and are therefore covered by the AAIC policies. (*Id.* at 2–3). Travelers further asserts that, at best, the language at issue in the Named Insured Limitation Endorsement is ambiguous and should therefore be construed in Travelers' favor. (*Id.* at 3.)

Based on the language of the AAIC General Liability Policy, coverage may be triggered for SC Emergency Services, as the only named covered emergency services organization in the Named Insured Limitation Endorsement of the AAIC General Liability Policy when: 1) there is an accident that causes a person to sustain a bodily injury; 2) death results from that bodily injury; and 3) the death as a result of the bodily injury "aris[es] out of the firefighting, ambulance, rescue or other emergency services, including operations incidental thereto, of the covered emergency service organization(s) shown in the schedule." (ECF No. 1-2 at 37.) It is undisputed in the record that the Victims died from smoke inhalation injuries sustained as a result of the apartment fire. (*See* ECF No. 42-15 at 4.) However, when determining if the third requirement, that the Victims' deaths "aris[e] out of the firefighting, ambulance, rescue or other emergency services, including operations incidental thereto, of [SC Emergency Services]," for coverage is met, ambiguity surfaces. (ECF No. 1-2 at 37.)

Though AAIC argues that the language "including operations incidental thereto, of the covered emergency service organization(s) shown in the schedule" signifies that the incidental operations described must be performed by SC Emergency Services, an objective reading of the provision in its entirety does not translate to that meaning as unequivocally as AAIC

suggests. First, the Court notes that the phrase "including operations incidental thereto" follows the phrase "arising out of the firefighting, ambulance, rescue or other emergency services" and is preceded by a comma and followed by a comma. This suggests that operations incidental to the listed emergency services are to be included in the coverage of the AAIC General Liability policy along with the listed emergency services from which a "bodily injury" must arise.

Further, the Court notes that the phrase "of the covered emergency service organization(s) shown in the schedule" follows the comma after "including operations incidental thereto." The question now becomes whether this portion of the endorsement, written in this manner, is sufficient to specify that the operations incidental to "the firefighting, ambulance, rescue or other emergency services" must also be performed by SC Emergency Services. While no North Carolina court has addressed this specific issue, the Court concludes that the phrase could reasonably be interpreted consistent with AAIC's construction or Travelers' construction, making it ambiguous.

The Court agrees that the phrase "of the covered emergency service organization(s) shown in the schedule" could be read to describe the incidental operations, as AAIC espouses. However, this portion of the provision does not definitively specify that the operations incidental to "the firefighting, ambulance, rescue or other emergency services" must also be performed by "the covered emergency service organization(s) shown in the schedule,"—that is, SC Emergency Services. In this case, the provision, as it is written, could also be reasonably interpreted to mean that the AAIC General Liability Policy applies to any incidental operations, even those incidental operations not performed by SC Emergency Services. This Court finds that the relevant language in the provision is "fairly and reasonably susceptible to

11

either of the constructions asserted by the parties" and is therefore ambiguous. *Maddox*, 280 S.E.2d at 908. As a result, this Court resolves this ambiguity in favor of the construction offered by Travelers and interprets the AAIC General Liability Policy to apply to any operations incidental to SC Emergency Services' firefighting, ambulance, rescue, or other emergency services.

a. Whether the Actions of the 911 Operators and Surry County Were "Operations Incidental" to SC Emergency Services

The Court next determines whether the actions of the 911 Operators and Surry County were "operations incidental" to the "firefighting, ambulance, rescue or other emergency services of" SC Emergency Services. (ECF No. 1-2 at 37.) Travelers specifically argues that the 911 Operators' actions as dispatchers were more than incidental to these services of SC Emergency Services, "and were actually *necessary* since the [SC Emergency Services] personnel could not have been dispatched but for the actions of the 911 . . . [O]perators." (ECF No. 44 at 8.) AAIC contends that this argument made by Travelers "misses the mark" because Travelers "misreads the Named Insure Limitation Endorsement." (ECF No. 42 at 19–20.) AAIC asserts that "[i]t is irrelevant that 911 communications and dispatch provided by SC Emergency Communications Center could considered be an 'essential part' of providing emergency services" because SC Emergency Communications Center is not part of SC Emergency Services and "911 communications and dispatch are not emergency services or incidental operations of [*SC Emergency Services*]." (*Id.* at 20 (quoting ECF No. 1 ¶ 23).)

"Courts have frequently been called upon to interpret the word 'incidental.'" *Peirson v. Am. Hardware Mut. Ins. Co.*, 107 S.E.2d 137, 139 (N.C. 1959). While the North Carolina Court of Appeals has declared the term to be "a nontechnical word" that, "unless the conte[x]t requires otherwise, must be given a meaning consistent with its use in ordinary speech," the

court went on to recognize that "that which is incidental can only be determined from the facts and circumstances of each case." *Lumbermens Mut. Cas. Co. v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 321 S.E.2d 10, 12 (N.C. Ct. App. 1984) (citations and internal quotation marks omitted).

*Lumbermens* provides further guidance on what may qualify something as "an operation incidental to" something else.[4] *Id.* at 13. There, a service garage owner assisted a customer in starting that customer's stalled truck after the truck had been serviced by the garage owner. *Id.* at 11. In the process of providing this assistance, an accident involving the truck took place on a nearby highway. *Id.* The service garage owner's garage liability insurance policy provided coverage for "bodily damage 'caused by an occurrence and arising out of garage operations.'" *Id.* Moreover, the term "[g]arage operations" was "defined as 'the ownership, maintenance or use of the premises for the purposes of a garage and all operations necessary or incidental thereto.'" *Id.* In interpreting the garage liability insurance policy, the North Carolina Court of Appeals held that the accident "was clearly a natural consequence of the operation of" the garage. *Id.* at 12. The court concluded that the accident was therefore an operation incidental to the use of the premises as a garage and covered under the garage liability insurance policy. *Id.* at 13.

---

[4] *Lumbermens* also highlights the case *Peirson v. Am. Hardware Mut., Ins. Co.*, 107 S.E.2d 137 (N.C. 1959). In *Peirson*, the North Carolina Supreme Court referenced cases from other courts to distinguish "something [that is] incidental to the main purpose" from something that is not. 107 S.E.2d at 139–40 (internal quotation marks omitted) (citing *Spiegel v. Felton,* 134 N.Y.S.2d 242, 206 Misc. 499 (1954) (holding that the sale of Christmas trees was not incidental to the operation of a parking lot); *Boh v. Pan Am. Petroleum Corp.,* 128 F.2d 864 (5th Cir. 1942) (holding that the use of premises for unrelated commercial advertising was not an activity incidental to the operation of a filling station); *Heritier v. Century Indem. Co.*, 109 N.J.L. 313, 162 A. 573 (1932) (holding that the transportation of wedding parties was not an incidental part of funeral business)).

13

The record in this case supports the categorization of the 911 Operators' actions as "operations incidental" to the emergency services of SC Emergency Services. The night of the fire, the 911 Operators were on duty at SC Emergency Communications Center. (ECF Nos. 42-13 ¶¶ 37–38; 42-14 at 10.) According to the SC Emergency Communications Center Standard Operating Procedure Manual, SC Emergency Communications Center serves to "dispatch appropriate sheriff, police, fire, ambulance and rescue services with the least possible delay after a request is received or requirement is known to exist." (ECF No. 42-4 at 3.) It is also undisputed that, the night of the fire, Mr. Shores dispatched members of SC Emergency Services to the fire, including a unit from the police department, the director of Emergency Medical Services, an ambulance, and the Disaster Response Team. (*See* ECF Nos. 42-13 ¶ 44; 42-14 at 10; 44-4 at 15:18–16:13.) The operations of SC Emergency Communications Center in communicating to, and dispatching, SC Emergency Services are vital to SC Emergency Services' operation and execution of its services. Thus, even more so than was true in *Lumbermens*, SC Emergency Communications Center's operations are more than "a natural consequence to the operation of" SC Emergency Services—they are a necessity.

In addition, the record supports that Surry County's actions are also classified as "operations incidental" to the emergency services of SC Emergency Services. The claim against Surry County in the Underlying Lawsuits alleges that Surry County failed to properly staff, train, and supervise the 911 Operators. (ECF Nos. 1 ¶ 7; 42-13 ¶¶ 99–105; 42-14 at 18–19.) The training, staffing, and supervision of the 911 Operators, whose actions and communications are essential to SC Emergency Services' operations and fulfillment of its duties, are services that are at least "a natural consequence" of SC Emergency Services' operations.

14

Therefore, the Court finds that the actions of the 911 Operators and Surry County were "operations incidental" to the emergency services of SC Emergency Services, specifically the emergency services listed in the Named Insured Limitation Endorsement of the AAIC General Liability Policy.

      b.  Whether the Victims' Deaths "Ar[ose] Out of" the Actions of the 911 Operators and Surry County

The Court now decides whether the Victims' deaths "ar[ose] out of" the alleged actions of the 911 Operators and Surry County. Under North Carolina law, the "arising out of" language in an insurance policy requires that there be "a real causal connection between the . . . services rendered and the damages." *Mastrom, Inc. v. Cont'l Cas. Co.*, 337 S.E.2d 162, 164 (N.C. Ct. App. 1985). The complaints of the Underlying Lawsuits allege that the "acts and omissions or series of acts and omissions" of the 911 Operators and Surry County were "direct and proximate cause[s]" of the Victims' deaths. (ECF Nos. 42-13 ¶¶ 105, 108, 122, 125; 42-14 at 19, 23.) As neither Party disputes this fact, the Court holds that the Victims' deaths arose out of the actions of the 911 Operators and Surry County the date of the fire.

Thus, the Court finds that the Victims' deaths are "bodily injur[ies]" that arose out of operations incidental to "the firefighting, ambulance, rescue or other emergency services" of SC Emergency Services, causing the Underlying Lawsuits brought in association with their deaths to fall within the language of the Named Insured Limitation Endorsement of the AAIC General Liability Policy. The Court holds, therefore, that the AAIC General Liability Policy covers the Underlying Lawsuits, and that AAIC is obligated to contribute to the settlement of the Underlying Lawsuits under its General Liability Policy.

      2.  <u>The AAIC Excess Policy</u>

The Court will next consider the language of the AAIC Excess Policy.

15

**SECTION I – COVERAGES**

1. **Insuring Agreement**

   a. We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "injury or damage" to which insurance provided under this Coverage Part applies.

   . . . .

   b. This insurance applies to "injury or damage" that is subject to an applicable "retained limit".

(ECF No. 1-2 at 62.) Under the AAIC Excess Policy, "injury or damage" includes any injury or damage covered in the AAIC General Liability Policy.[5] (*Id.* at 66.)

The Named Insured Limitation Endorsement of the AAIC Excess Policy, identifying SC Emergency Services as the only designated emergency services organization in its schedule, declares: "This insurance applies only to the 'injury or damage' covered by this insurance and arising out of the firefighting, emergency, rescue or incidental operations of the emergency service organization(s) designated in the above Schedule." (*Id.* at 79.)

The Court emphasizes that the portion of this Named Insured Limitation Endorsement concerning the application of the Excess Policy to incidental operations is written as "incidental operations *of* the emergency service organization(s) designated in the above Schedule." (*Id.* at 79 (emphasis added).) Unlike the Named Insured Limitation Endorsement of the AAIC General Liability Policy, the language of the Named Insured Limitation Endorsement of the Excess Policy is unambiguous in its communication that the "incidental operations" must be performed by SC Emergency Services in order for the Excess

---

[5] More specifically, the term "injury or damage" as defined under the AAIC Excess Policy means "any injury or damage, covered in the applicable 'controlling underlying insurance' arising from an 'event.'" (ECF No. 1-2 at 66.) The defined term "event" means "an occurrence, offense, accident, act, or other event, to which the applicable 'controlling underlying insurance' applies," (*id.*), and the AAIC General Liability Policy is an insurance policy amongst those listed in the Schedule of the AAIC Excess Policy's "controlling underlying insurance," (*see id.* at 61).

Policy to cover an "injury or damage" as defined under the policy "and arising out of the . . . incidental operations." (*Id.*) Since the entire language of this Named Insured Limitation Endorsement is "clear and unambiguous," the Court enforces this provision of the Excess Policy as it is written. *Pendergraph*, 507 S.E.2d at 919 (quoting *Cone Mills*, 443 S.E.2d at 359).

Since, under this Named Insured Limitation Endorsement, the "incidental operations" have to be performed by SC Emergency Services, the only ways in which either of the Underlying Lawsuits could be covered by the Excess Policy are if, the date of the fire: 1) the 911 Operators were employed by SC Emergency Services, 2) SC Emergency Communications Center was part of SC Emergency Services, or 3) the County was part of SC Emergency Services. The Court finds that Surry County is not part of SC Emergency Services. With respect to the status of the 911 Operators and SC Emergency Communications Center however, Travelers argues that, even after an organizational restructuring took place in 2017, SC Emergency Communications Center "functionally remained a part of" SC Emergency Services, and that the 911 operators were employees of SC Emergency Services. (ECF No. 44 at 6.) AAIC asserts, on the other hand, that undisputed facts demonstrate that the 911 Operators were not employed by SC Emergency Services and that SC Emergency Communications Center was not part of SC Emergency Services at the time of the fire, arguing that "[t]he 'facts' Travelers offers in support of its argument are blatantly contradicted by the record evidence." (ECF No. 45 at 7–8.)

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. The Fourth Circuit has recognized that this also applies to the more specific situation involving

17

a witness' deposition testimony that is blatantly contradicted by the record. *Hodges v. Fed.-Mogul Corp.*, 621 F. App'x 735, 741 (4th Cir. 2015) (unpublished). According to the Fourth Circuit, in such situations, any "alleged factual dispute created by the testimony need not be credited and 'will not defeat an otherwise properly supported motion for summary judgment.'" *Id.* (quoting *Scott*, 550 U.S. at 380).

According to testimony from Surry County Assistant Manager Sandra Snow, at a Surry County Board of Commissioners meeting on April 6, 2017, "the Board voted unanimously to establish a new departmental structure for Surry County Communications with the establishment of an advisory committee consisting of the County Manager, Emergency Services Director, and Sheriff."[6] (ECF No. 45-4 at 109:25–110:4.) Ms. Snow testified that, as a result, SC Emergency Communications Center "became its own department" and, as of that date, reported to the County Manager. (*Id.* at 109:2–110:9.) Ms. Snow also stated in her testimony that, although the Sheriff and the Director of SC Emergency Services had an "advisory role" in relation to SC Emergency Communications Center, neither the Sheriff nor the Director of SC Emergency Services had any supervisory responsibility over SC Emergency Communications Center. (*Id.* at 24:20–25:1.)

The record also includes evidence of filings and pleadings of Surry County[7] and the 911 Operators in the Underlying Lawsuits that support that the 911 Operators were not employed by SC Emergency Services. In Surry County's Answer to the allegation in one of

---

[6] In Ms. Snow's testimony, she references "the Board of Commissioners' minutes" as the Surry County record that reflect this information. (*See* ECF No. 45-4 at 109:6-7.) The minutes from the April 6, 2017, Surry County Board of Commissioners' meeting are also present in the case record and support Ms. Snow's testimony. (*See* ECF No. 45-13 at 38.)

[7] Surry County responded to complaints and written discovery requests on behalf of SC Emergency Services and SC Emergency Communications Center before those two entities were dismissed from the Underlying Lawsuits. (*See generally* ECF Nos. 45-13; 45-14.)

18

the complaints in the Underlying Lawsuits that the 911 Operators "were employees and agents of" Surry County, SC Emergency Communications Center, and SC Emergency Services, (ECF No. 45-9 at 21), Surry County "admitted that Shores and Cook were employed by Surry County and worked at [SC Emergency Communications Center]," yet denied that either of the 911 Operators were employees of SC Emergency Services,[8] (ECF No. 45-14 ¶ 112). In response to interrogatories asking about the nature of the employment relationship between SC Emergency Services and the 911 Operators, Surry County stated that "[n]o such employment relationship" existed. (ECF No. 45-13 at 7.) Surry County's responses to certain Requests for Admissions and Requests for Productions remained in line with its pattern of denying the 911 Operators' employment by SC Emergency Services. (*Id.* at 10–11, 15.) Moreover, in response to a Request for Admission in the Underlying Lawsuits, Surry County denied that SC Emergency Services included "E-911 services." (ECF No. 45-13 at 15.) The Court additionally notes that, when the 911 Operators themselves were asked in interrogatories about the nature of their employment relationship with Surry County, each responded that they were "employed by Surry County, and . . . work[ed] at a constituent department, the Surry County Emergency Communications Center." (ECF Nos. 45-16 at 4–5; 45-17 at 4–5.)

Furthermore, in their briefs, both Parties have referenced organizational charts that illustrate the departmental structure and organizational hierarchy of Surry County's government, SC Emergency Services, and SC Emergency Communications Center. (*See* ECF Nos. 42 at 4–5; 44 at 6; 45 at 2–3, 8–9.) In the chart labeled "Surry County Government

---

[8] Further, in that same Answer, but in response to a different allegation, Surry County denied that "the Director of [SC Emergency Services] had direct oversight of the personnel and facilities of [SC Emergency Communications Center]." (ECF Nos. 45-9 at 7; 45-14 ¶ 13.)

19

Organization Chart," SC Emergency Services and SC Emergency Communications Center are shown to be separate, individual County departments that each report directly to the County Manager. (ECF No. 42-2 at 2.)[9] The "Surry County 911 Organization Chart" describing the hierarchy of SC Emergency Communications Center as of May 20, 2019, include the names of Mr. Shores and Mr. Cook, with Mr. Shores labeled as a "supervisor" and Mr. Cook labeled as a "telecommunicator."[10] (ECF No. 42-2 at 3.) Neither Party contests the authenticity of these charts or contends that any of the aforementioned observations from the charts are inaccurate, with exception to the error associated with the "Surry County Government Organization Chart." *See supra* note 9. Thus, with exception to that minor error, the Court considers each of the charts as accurate representations of Surry County's government, SC Emergency Services, and SC Emergency Communications Center.

The record is replete with evidence supporting that the 911 Operators were employees of SC Emergency Communications Center and that SC Emergency Communications Center was not part of SC Emergency Services. However, Travelers argues that the record includes evidence of testimony to the contrary. (ECF No. 44 at 6–7.) Travelers points out that Ms.

---

[9] Travelers concedes that SC Emergency Communications Center is referred to as "Communications (E-911)" in the "Surry County Government Organization Chart." (ECF No. 44 at 6.) Also, the Court recognizes that the color-coding of this particular chart actually indicates that SC Emergency Services is a County department and that SC Emergency Communications Center is a departmental subdivision. (*See* ECF No. 42-2 at 2.) However, in Ms. Snow's testimony, she states that such a depiction "was a mistake," and that SC Emergency Communications Center should have been color-coded in the way that reflected that it was its own County department. (ECF No. 45-4 at 111:13-24.) Ms. Snow's statements regarding this mistake in the color-coding of this chart are undisputed in the record.

[10] In their responses to interrogatories in the Underlying Lawsuits, Mr. Shores identified his immediate supervisor as Stephanie Connor, the Director of the Communications Center, and Mr. Cook identified his immediate supervisor as Mr. Shores. (ECF Nos. 45-17 at 5; 45-16 at 5.) This is precisely what is reflected in the chart depicting the departmental hierarchy of SC Emergency Communications Center as of May 20, 2019. (*See* ECF No. 42-2 at 4.)

Snow testified that there were no changes in the functionality of SC Emergency Communications Center after the 2017 restructuring and that Mr. Shores testified that he was expected to follow EMS protocols and policies. (ECF No. 44 at 7 (citing ECF Nos. 44-18 at 60:1-5; 44-17 at 201:5-15).) Further, in his deposition, Mr. Shores testified that the "telecommunicator" position is "emergency management" and "a part of . . . EMS in Surry County." (ECF No. 44-16 at 48:4-19.)

Neither Ms. Snow's statements nor Mr. Shores' statements serve to rebut the breadth of evidence supporting that the 911 Operators were not employed by SC Emergency Services, and that SC Emergency Communications Center was separate from SC Emergency Services, in a way creates a "genuine issue." As for Mr. Shores' testimony concerning his position being a part of EMS, such a statement is "blatantly contradicted" by the extensive record demonstrating that Mr. Shores was employed only by SC Emergency Communications Center, its own department, after April 2017. Moreover, Travelers provides no legal support for its argument that SC Emergency Communications Center "functionally remained a part of" SC Emergency Services. (ECF No. 44 at 6.) Though Travelers raises this limited testimony from the record, it is not sufficient to create a "genuine issue of material fact" as to whether the 911 Operators were employed by SC Emergency Services or whether SC Emergency Communications Center was part of SC Emergency Services, and this Court concludes that no reasonable juror could find otherwise.

Further, because the Court concludes that the 911 Operators were not employed by SC Emergency Services and that SC Emergency Communications Center was not part of SC Emergency Services, the actions of the 911 Operators and Surry County are not covered by

the AAIC Excess Policy, and AAIC is not required to contribute to the settlement of the Underlying Lawsuits under this Excess Policy.

The Court will next address the issue of AAIC's contribution amount.

**B.      The Contribution Amount of AAIC**

As previously held, AAIC is required to contribute to the settlement payment of the Underlying Lawsuits under its General Liability Policy, but is not required to contribute under its Excess Policy. With respect to AAIC's provided coverage under its General Liability Policy, Travelers argues that, pertaining to the settlement shares allocated to each of the 911 Operators, AAIC pays first in accordance with the AAIC General Liability Policy. (ECF No. 44 at 11.) Travelers also argues that AAIC is responsible for the settlement share allocated to Surry County, since Travelers' general liability policy and excess policy both provide that governmental immunity is preserved and not waived. (*Id.* at 13.) AAIC contends, however, that Travelers is not entitled to recover any amount of the settlement payment that was allocated to the County because Travelers paid the portion of the settlement as a "volunteer." (ECF No. 45 at 16.) AAIC and Travelers have agreed upon the allocation of $3,000,000 to each of the final remaining defendants in the Underlying Lawsuits: Surry County, Mr. Shores, and Mr. Cook. (ECF No. 44 at 11 n.4.)

The Court considers again the general liability policies of AAIC and Travelers. According to their respective policies, each Party has a limit of $1,000,000 per occurrence under its general liability policy. (ECF Nos. 1-1 at 29; 1-2 at 36.) Further, the insurance under each Party's policy is primary, and because each policy permits for the method of sharing by "contribution by equal shares," "each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first." (ECF Nos.

22

1-1 at 38; 1-2 at 53.)  Additionally, Travelers' general liability policy includes a Preservation of Governmental Immunity Endorsement that states that the purchase of the policy "is not a waiver . . . of any governmental immunity that would be available to [Surry County] had [it] not purchased this policy." (ECF No. 1-1 at 14.)  The endorsement also states that the policy provides coverage for tort liability "only to the extent that such tort liability is not subject to any defense of governmental immunity under North Carolina law."  (*Id.*)  The Court views this policy language from each Party's general liability policy as "clear and unambiguous" and thus "determine[s] the legal effect of the language used . . . [in order] to enforce the agreement as written."  *Pendergraph*, 507 S.E.2d at 919 (quoting *Cone Mills*, 443 S.E.2d at 359 (internal quotation marks omitted)).

Under North Carolina law, preservation of immunity provisions are valid and enforceable.  *See Burroughs v. Page*, No. 1:17-cv-463, 2019 WL 5561043, at *10 (M.D.N.C. Oct. 28, 2019); *Patrick v. Wake Cnty. Dept. of Hum. Servs.*, 655 S.E.2d 920, 924 (N.C. Ct. App. 2008); *Bullard v. Wake Cnty.*, 729 S.E.2d 686, 689 (N.C. Ct. App. 2012).  As Travelers acknowledges, Surry County properly pled the governmental immunity defense.  (ECF Nos. 44 at 13; 25-2 at 3.)  As the governmental immunity defense was pled, the claim against Surry County was indeed subject to the governmental immunity defense.  *See Burroughs*, 2019 WL 5561043 at *10 (holding that a similar preservation of governmental immunity provision found in a Travelers insurance policy for another North Carolina county "expressly excluded" tort liability "which could be subject to governmental immunity").  Thus, Travelers had no obligation under its general liability policy to provide coverage to Surry County.

"Subrogation is not generally decreed in favor of a 'volunteer' who, without any moral or other duty, pays the debt or discharges the obligation of another."  *Nationwide Mut. Ins. Co.*

23

*v. Am. Mut. Liab. Ins. Co.*, 365 S.E.2d 677, 678 (N.C. Ct. App. 1988). Further, "one making payment to another is ordinarily a volunteer without subrogation rights if he [or she] had no right or interest of his [or her] own to protect and acts without any obligation." *Id.* Since Travelers is not responsible for paying the settlement amount for Surry County due to the claim against the County in the Underlying Lawsuits being subject to the governmental immunity defense, Travelers is not responsible for paying any amount to the County from its general liability policy. As Travelers' obligations to the County under Travelers' general liability policy are $0, under the "equal shares" approach that is incumbent upon both Parties under their general liability policies, AAIC's payment obligations to the County are also $0. Because Travelers paid $3,000,000 to the County even though it had no obligation to do so, Travelers is not entitled to any contribution from AAIC with respect to the County.

Because each Party has a limit of $1,000,000 per occurrence under its general liability policy, and as the settlement amounts of the claims against the two 911 Operators in the Underlying Lawsuits are the only amounts now eligible for coverage by both Parties, under the "equal shares" approach of their general liability policies, Travelers and AAIC are each required to pay a) $500,000 to settle the claims against Mr. Cook in the Underlying Lawsuits and b) $500,000 to settle the claims against Mr. Shores in the Underlying Lawsuits.

Therefore, the Court holds that AAIC is required to contribute $1,000,000 to the settlement payment of the Underlying Lawsuits under its General Liability Policy only.

## IV. AAIC'S OBJECTION AND MOTION TO DISREGARD IS MOOT

In support of its argument regarding the amount it may have to contribute to the settlement of the Underlying Lawsuits, after AAIC's Motion for Leave to File Surreply was granted by this Court, (ECF No. 52 at 1), AAIC filed its Surreply, (ECF No. 53). Travelers

filed a Response to the Surreply, (ECF No. 54), and AAIC objected and moved the Court to disregard Travelers' Response to Surreply, (ECF No. 55 at 1).

The only issue upon which AAIC focuses in its Surreply is whether the settlement payment of the Underlying Lawsuits should be allocated between the AAIC Excess Policy and the Travelers excess policy according to a "pro rata by limits" method of allocation. (ECF No. 53 at 1–2, 4–5.) As the Court has held that the AAIC Excess Policy does not cover the Underlying Lawsuits, the issue of allocation involving the Excess Policy is immaterial to the calculation of AAIC's contribution amount. Consequently, Travelers' Response on this issue is likewise immaterial. The calculation of AAIC's contribution amount is exclusively related to the policy that the Court has held does cover the Underlying Lawsuits, the AAIC General Liability Policy.

Accordingly, this Court denies AAIC's Objection and Motion to Disregard as moot.

## V. CONCLUSION

In sum, the Court concludes that AAIC is required to contribute to the settlement of the Underlying Lawsuits with respect to its AAIC General Liability Policy in the amount of $1,000,000. The Court further concludes, however, that AAIC is not required to contribute under the AAIC Excess Policy. The Court therefore will deny AAIC's motion for summary judgment in part and will grant the motion in part. In addition, and for the same reasons as outlined above, the Court will grant Travelers' motion for summary judgment in part, and deny its motion in part. The Court further concludes that, in light of the Court's rulings on the Parties' cross-motions for summary judgment, AAIC's Objection and Motion to Disregard will be denied as moot.

For the reasons stated herein, the Court enters the following:

**ORDER**

**IT IS THEREFORE ORDERED** that AAIC's Motion for Summary Judgment, (ECF No. 41), is **DENIED IN PART AND GRANTED IN PART**. The Court denies the motion as to the AAIC General Liability Policy's lack of coverage of the Underlying Lawsuits and grants the motion as to the AAIC Excess Policy's lack of coverage of the Underlying Lawsuits.

**IT IS FURTHER ORDERED** that Travelers' Motion for Summary Judgment, (ECF No. 43), is **GRANTED IN PART AND DENIED IN PART**. The Court grants the motion as to the AAIC General Liability Policy's coverage of the Underlying Lawsuits and denies the motion as to the AAIC Excess Policy's coverage of the Underlying Lawsuits. The Court hereby **ORDERS AND DECLARES** that AAIC owes to Travelers a contribution of $1,000,000 to the settlement payment of the Underlying Lawsuits.

**IT IS FURTHER ORDERED** that AAIC's Objection and Motion to Disregard, (ECF No. 55), is **DENIED AS MOOT**.

This, the 13th day of March 2024.

/s/ Loretta C. Biggs
United States District Judge